FILED

2015 Jun-22  PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SHANNON LILIENTHAL,** | ) | |
| **individually, and on behalf of a** | ) | |
| **class of similarly  situated** | ) | |
| **individuals,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **AT&T, CORP. and** | ) | |
| **AT&T MOBILITY, LLC,** | ) | **CLASS ACTION** |
| | ) | |
| **Defendants.** | ) | |

## CLASS ACTION
## COMPLAINT

COMES NOW, Shannon Lilienthal, Plaintiff in the above-styled action, files her Complaint both individually and on behalf of a class of similarly-situated individuals against the Defendants AT&T, CORP. and AT&T MOBILITY, LLC (collectively, "AT&T"), and, in support thereof, shows as follows:

### INTRODUCTION

1.     This is an action seeking redress for unfair conduct.  Shannon Lilienthal signed up for a mobile phone plan through AT&T.  Based on her family's needs, she chose the so-called Unlimited Data Plan. But she noticed something. Towards the end of each billing cycle, her data speeds decreased. The reasons were unclear, until recently.  As a result of an extensive investigation

conducted by the Federal Communications Commission, we now know why -- AT&T was slowing Ms. Lilienthal's data speeds intentionally.  AT&T did this, in disregard of its contract with Ms. Lilienthal, for the simple purpose of making more money. Ms. Lilienthal brings this action representing not only herself, but also consumers across the country to compel AT&T to live up to the promises it made to its customers.

## JURISDICTION AND VENUE

2.     This action arises under the U.S. Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715.

3.     This Court maintains subject matter jurisdiction under 29 U.S.C. § 216(b), and 28 U.S.C. § 1337.

4.     Venue is proper in this Court as the unlawful practices alleged herein have been committed within the Northern District of Alabama.

## PARTIES

5.     Shannon Lilienthal, Plaintiff, is a resident of Huntsville, Alabama.

6.     The Defendant, AT&T CORP. is an entity doing business in the State of Alabama.  This Defendant maintains its corporate headquarters in Dallas, Texas.

7.     The Defendant AT&T MOBILITY, LLC is an entity doing business in the State of Alabama.  Upon present information and belief, AT&T MOBILITY, LLC. is a subsidiary of AT&T CORP.

8.     Defendants, AT&T CORP. and AT&T MOBILITY, LLC, are collectively referred to hereinafter as "AT&T" or Defendants.

## FACTUAL ALLEGATIONS

## Facts Common to All Counts

9.     Defendant is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data to, among other things, send and receive email, use GPS navigation, watch streaming video, and browse the internet.

10.    In 2007, Defendant became the exclusive mobile data provider for the Apple iPhone. Initially, Defendant offered iPhone customers an "unlimited" mobile data plan for $20 per month. In 2008, when the iPhone 3G was released, Defendant increased the fee for the unlimited mobile data plan to $30 per month, and required all iPhone 3G customers to purchase the data plan. As Defendant began offering subsequent versions of the iPhone and smartphones from competing manufacturers, it imposed a similar requirement on purchasers of those devices.

11.    In June 2010, Defendant ceased offering the unlimited mobile data plan to new smartphone customers and, since then, has required new smartphone customers to purchase one of Defendant's "tiered" mobile data plans. Unlike the unlimited mobile data plan, Defendant's tiered mobile data plans specify a data allowance (e.g., 250 MB, 3 GB), and customers who exceed the stated data

allowance are charged for the additional data at the rate set forth in the tiered mobile data plan.

12.     By the time Defendant stopped offering the unlimited mobile data plan to new customers, millions of customers had accepted Defendant's offer to purchase an unlimited mobile data plan. Since June 2010, Defendant has offered to grandfather these customers' unlimited mobile data plan when they purchase a new smartphone, giving them the opportunity to continue with their unlimited mobile data plan, rather than requiring them to switch to Defendant's tiered mobile data plans. The renewed plan continues to cost $30 per month.

13.     Defendant has offered to grandfather customers' existing unlimited mobile data plan to induce customers who have this plan not to switch mobile data providers. Competing mobile data providers have offered data service for smartphones for several years, including, since 2011, for the iPhone.

14.     Defendant has communicated to existing customers the offer to renew their unlimited mobile data plan via in-store or telephone representatives or on Defendant's website.  In response to this offer, millions of Defendant's unlimited mobile data plan customers have elected to keep their unlimited mobile data plan rather than switch to a tiered mobile data plan or obtain service from another provider.

15.     In July 2011, Defendant decided to begin reducing the data speed for

unlimited mobile data plan customers, a practice commonly known as "data throttling." Under Defendant's throttling program, if an unlimited mobile data plan customer exceeds the limit set by Defendant during a billing cycle, Defendant substantially reduces the speed at which the customer's device receives data for the rest of that customer's billing cycle.

16.    In October 2011, Defendant began restricting the data speed for unlimited mobile data plan customers whose data usage exceeded thresholds imposed by Defendant. Initially, the data usage threshold at which Defendant throttled customers varied across geographic markets.  The threshold was as low as 2 GB per billing cycle in dense markets like New York City and the San Francisco Bay Area.

17.    In March 2012, Defendant modified its data throttling program. Under the revised version, Defendant set a uniform nationwide data usage threshold of 3 GB per billing cycle for devices using Defendant's 3G network (e.g., iPhone 3G, 3GS, 4) and HSPA+ network (e.g., iPhone 4S), and 5 GB per billing cycle for devices using Defendant's LTE network (e.g., iPhone 5, 5S, 6, 6 Plus).

18.    Under the original version of Defendant's throttling program, from October 2011 through February 2012, Defendant capped the data speed at 128 Kbps for customers who exceeded the data usage threshold. Under the revised version, starting in March 2012 and continuing to the present, Defendant caps the

data speed at 256 Kbps for customers with 3G and HSPA+ devices and 512 Kbps for customers with LTE devices.

19.    Typical unthrottled speeds on AT&T's network range from 700 Kbps to 1.7 Mbps for 3G devices, 2 to 6 Mbps for HSPA+ devices, and 5 to 12 Mbps for LTE devices.

20.    Customers who have been throttled by Defendant have experienced drastically reduced service under both the original and revised versions of the throttling program. Numerous customers using 3G devices have experienced an 80–90% decrease in speed when throttled under the original version of Defendant's throttling program, and a 60–85% decrease under the revised version. Numerous customers using HSPA+ devices have experienced a 90– 95% decrease in speed when throttled under the original version, and an 85–95% decrease under the revised version. Numerous customers using LTE devices have experienced a 95% decrease in speed when throttled under the original version, and a 90–95% decrease under the revised version. As a result, under both versions, many everyday applications, such as web browsing, GPS navigation, and streaming video, are significantly slower, and in some cases are severely impaired or rendered practically inoperable.

21.    When it implemented its throttling program, Defendant possessed internal focus group research indicating that its throttling program was inconsistent

with consumer understanding of an "unlimited" data plan. The researchers concluded that, "[a]s we'd expect, the reaction to [a proposed data throttling program] was negative; consumers felt 'unlimited should mean unlimited[.']" The focus group participants thought the idea was "clearly unfair." The researchers highlighted a consumer's comment that "[i]t seems a bit misleading to call it Unlimited." The researchers observed that "[t]he more consumers talked about it the more they didn't like it." This led the researchers to advise that "[s]aying less is more, [so] don't say too much" in marketing communications concerning such a program.

22.    When it revised its throttling program, Defendant was aware of third-party research showing that, at 256 Kbps, two-thirds of customers are unsatisfied with webpage render time, and that, at 512 Kbps, one-third of customers are unsatisfied with render time. According to the same research, at 128 Kbps, 93% of customers are unsatisfied with webpage render time.

23.    Thousands of customers have submitted written complaints concerning Defendant's throttling program to Defendant, the Better Business Bureau, and government agencies. In addition, Defendant has received more than 190,000 customer calls relating to its throttling program.

24.    Numerous complaining customers have accused Defendant of failing to live up to its end of their bargain because its throttling program imposes a

limitation on their unlimited data plan. The following excerpts are illustrative of the consumer complaints:

    a.  "Unlimited means without restriction, [but] AT&T slowing the speed of data by 90% is RESTRICTING my data."

    b.  "I would like AT&T to honor the contract that we signed up with that allowed us to continue our unlimited data plan . . . . I would like the advertisement of 'Nation[']s fastest LTE Network' to be honored."

    c.  "If [I'm] being punished for using my phone and plan as advertised[,] then I have lost a lot of respect for [AT&T]."

    d.  "This is a clear case of bait and switch."

    e.  "I have a 2–3 hour commute to my job and use [P]andora and YouTube. I am losing money paying for Hulu, Netflix, and Pandora . . .because AT&T has changed the rules yet again . . ."

25.    Many customers also have expressed their frustration at the effect Defendant's throttling program has on their ability to load webpages and to perform common functions they had come to rely on. The following excerpts are illustrative of the consumer complaints:

    a.  "When loading a page, it can take forever for it to load or it doesn't load at all. . . . When I needed to use the GPS when I am lost, I am

unable [to] because they slowed down my data plan to the point that I am not able to use it to look up directions."

b. "Recently, AT&T has . . . effectively slow[ed] my speed down to where I cannot listen to music during the day or stream video."

c. "I'm no longer able to access basic functions, such as email or [F]acebook, because the [data] speed . . . does not allow these services to function."

d. "Apps such as email, social media, calendar, word processing, streaming music, navigation, and data backup frequently stop working without the ability to reliably connect to the data network at a reasonable speed."

e. "My speed [has] been decreased from 50mbps to 0.5mbps! . . . I have to go to find [Wifi] to be able to post pictures, videos and use my device."

26.    The speed reductions and service restrictions in effect under Defendant's throttling program are not determined by real-time network congestion at a particular cell tower.  Throttled customers are subject to this reduced speed even if they use their smartphone at a time when Defendant's network has ample capacity to carry the customers' data, or the use occurs in an area where the network is not congested. Once customers have been throttled

during a given billing cycle, Defendant caps their download speed until the end of the billing cycle, at which time Defendant restores the data speed for these customers to full speed.

27.     Since October 2011, Defendant has throttled its customers more than 25 million times, affecting more than 3.5 million unique customers. When a customer is throttled, the customer's data speed is reduced, on average, for the last twelve days of the customer's thirty-day billing cycle.

28.     Defendant has numerous alternative ways to reduce data usage on its network that do not involve violating its promise to customers. One alternative would involve Defendant requiring existing unlimited data customers to switch to a tiered data plan at renewal. Defendant considered and rejected this approach in part because of concern that renewing customers would switch providers rather than switch to one of Defendant's tiered data plans. Another alternative would involve Defendant introducing its throttling program at renewal, with disclosures at point of sale. Defendant considered and rejected such an alternative, in part because it "[a]pplied to all customers" and would not let Defendant "isolat[e] communications to [the] heaviest users." Yet other alternatives might include limited, narrowly tailored throttling programs that are consistent with Defendant's contracts, advertising, and other public disclosures.

29.     At the same time that Defendant has been throttling unlimited mobile

10

data plan customers who exceed 3 or 5 GB of data usage during a billing cycle, Defendant has been offering individual tiered mobile data plans for data usage of at least 30 GB per billing cycle. Defendant does not throttle its tiered mobile data plan customers, regardless of the amount of data that a tiered mobile data plan customer uses.

30.     Defendant has disseminated or has caused to be disseminated advertisements and promotional materials for mobile data plans, including but not limited to, the following statements:

    a.     iPhone Brochure

        iPhone combines three amazing products—a mobile phone, a widescreen iPod and a breakthrough Internet device—into one small, lightweight, handheld device with rich HTML email, web browsing, searching and Google Maps.

        Breakthrough Internet Device
        iPhone offers a rich HTML email client and Safari—the most advanced web browser ever on a portable device. It automatically syncs bookmarks from a PC or Mac and has built-in Google and Yahoo! Search. It also multitasks, so you can read a web page while downloading your email in the background over Wi-Fi or EDGE.

        AT&T Plans for iPhone
        To use iPhone, you'll need to sign up for a 2-year service agreement or a renewed 2-year service agreement if you are already an AT&T customer. Plans start at $59.99 and include Visual Voicemail, Unlimited Data (email and web) and 200 SMS text messages—for use in the U.S. . . . You can browse the Internet and send emails as often as you like without being charged extra.

Data Plans for iPhone (U.S. Coverage Packages)
. . . A Data Plan for iPhone gives you Visual Voicemail, Unlimited Data (email and web) and SMS text messaging—for use in the U.S.

b.    iPhone 3G Brochure

Introducing iPhone 3G. With fast 3G wireless technology, Maps with GPS, support for enterprise features like Microsoft Exchange, and the new App Store, iPhone 3G puts even more features at your fingertips. And like the original iPhone, it combines three products in one—a revolutionary phone, a widescreen iPod, and a breakthrough Internet device with rich HTML email and full web browsing. iPhone 3G. It redefines what a mobile phone can do—again.

Internet In Your Pocket
iPhone uses fast 3G and Wi-Fi wireless connections to deliver rich HTML email, Maps with GPS, and Safari—the most advanced web browser on a portable device. iPhone automatically syncs bookmarks from your PC or Mac and has Google and Yahoo! search built in. Since iPhone multitasks, you can even make a phone call while emailing a photo or surfing the web over a Wi-Fi or 3G connection.

Maps with GPS
Find your location, get directions, and search for nearby businesses—all from your phone. Maps on iPhone 3G combines GPS, Wi-Fi, and cell tower location technology to create the best map application on a mobile phone.
. . . .
AT&T Plans for iPhone 3G (U.S. Coverage Packages)

AT&T Nation$^{SM}$

UNLIMITED Data (Email/Web) . . . .
AT&T FamilyTalk$^{SM}$
*Includes 2 lines*

UNLIMITED Data (Email/Web) . . . .

  c.  iPhone 3GS Brochure

    AT&T Advantages

    The Nation's Fastest 3G Network

    AT&T Nation$^{SM}$ for iPhone
    Unlimited Data, Unlimited Mobile to Mobile, Unlimited Nights
    & Weekends, Visual Voicemail and Rollover

31. Defendant's wireless customer agreements for unlimited mobile data plan customers prohibit the use of Defendant's data service for certain activities, such as operating a server, using peer-to-peer file-sharing services, sending spam email, and using data in a way that adversely impacts network or service levels or hinders access to the wireless network. The agreements provide that Defendant may modify, deny, disconnect, or terminate the service of customers who use the service for such prohibited activities.

32. Defendant's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity. Nor do the agreements provide that Defendant may modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data.

33. Defendant requires most customers with an unlimited mobile data plan, when purchasing a new smartphone, to enter into a contract with a long-term service commitment (typically lasting two years) in which customers who cancel

service before the end of the service commitment must pay an early termination fee ("ETF"), typically in the hundreds of dollars.

34.    Defendant does not inform unlimited mobile data plan customers at renewal that their access to mobile data may be severely limited by Defendant's throttling program.

35.    The only information concerning Defendant's throttling program that Defendant sent to most customers prior to their renewal of their unlimited mobile data plan was a statement included in their July or August 2011 monthly bill. The statement read as follows:

> Important Update for Unlimited Data Plan Customer
>
> To provide the best possible network experience, starting 10/01/11, smartphone customers with unlimited data plans whose usage is in the top 5% of users can still use unlimited data but may see reduced data speeds for the rest of their monthly billing cycle. We'll alert you if you near the top 5%. To avoid slowed speeds you may use Wi-Fi or choose a tiered data plan. Details @ att.com/data plans.

The statement failed to disclose the degree to which the customers' data speed would be reduced, and the impact that the reduced speed would have on customers' ability to use their device. It also failed to adequately disclose that the speed reduction was due to a limit intentionally imposed by Defendant, as opposed to general network congestion. Many unlimited mobile data plan customers have renewed their contract months, or even years, after this statement appeared in their bill.

36.    A minority of unlimited mobile data plan customers have received one or more text messages concerning Defendant's throttling program prior to renewing their unlimited mobile data plan. Only those customers who approach or exceed the data usage threshold are sent a text message. A subset of these customers also have been sent an email concerning Defendant's throttling program. Most unlimited mobile data plan customers have never been sent a text message or email concerning Defendants' throttling program.

37.    Even those customers who are sent a text message or email concerning Defendants' throttling program prior to renewing their unlimited mobile data plan are not adequately informed of the throttling program. The text messages and emails do not adequately disclose the limits that Defendant's throttling program imposes on their unlimited mobile data plan, and many customers renew their contract months, or even years, after Defendant sends such a text message or email.

38.    Many of Defendant's customers subscribe to family plans. Family plans cover more than one wireless device and may share minutes and text messaging among those devices. Each smartphone on a family plan is typically subject to a separate long-term service commitment with Defendant for the provision of mobile data. Family plan customers who wish to cancel service for their family must pay an ETF for each smartphone on the plan that is currently

subject to such a fee.

39.   Defendant throttles unlimited mobile data plan customers regardless of whether the customers' contract permits them to cancel without incurring a substantial ETF.

40.   Defendant has not given unlimited mobile data plan customers subject to Defendant's throttling program the opportunity to cancel their individual or family plans without incurring one or more substantial ETFs.

41.   Numerous unlimited mobile data plan customers have canceled their unlimited mobile data plans after being throttled by Defendant.

42.   Defendant has collected substantial ETFs from unlimited mobile data plan customers who cancelled service after being throttled.

43.   In 2010, the FCC adopted the Open Internet Transparency Rule ("Transparency Rule") which mandates that broadband access providers, such as AT&T, disclose accurate information sufficient to enable consumers to make informed choices regarding their use of broadband Internet services and to ensure they are not misled or surprised by the quality or cost of the services they actually receive.

44.   The Transparency Rule applies to every provider of broadband Internet access services in the United States, including mobile broadband Internet access providers.  The Commission adopted the Transparency Rule in the 2010

16

Open Internet Order, and the rule has been in effect since November 20, 2011.

45.     Section 8.3 of the Commission's Transparency Rule, provides that:

> A person engaged in the provision of broadband Internet access service shall publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings.

46.     In June 2007, AT&T began to offer unlimited wireless data plans, which allowed customers to use unrestricted amounts of data, with no high-speed data caps or automatic speed restrictions.  AT&T ceased offering these unlimited plans to new customers in June 2010, but continues to allow "grandfathered" customers on unlimited data plans to renew their plans on a month-to-month or term contract basis.

47.     In 2011, AT&T implemented its Maximum Bit Rate ("MBR") policy, under which AT&T capped the maximum speed throughput that unlimited data plan customers experienced once they used a set amount of data in a billing cycle. AT&T applied the MBR policy to 4G LTE customers once they used five gigabytes of data during a billing cycle and to 3G and other 4G customers once they used three gigabytes of data during a billing cycle.

48.     On June 17, 2015, the FCC released a Notice of Apparent Liability for Forfeiture and Order ("NALF") finding that AT&T apparently willfully and

repeatedly violated the Commission's Transparency Rule by: (1) using the misleading and inaccurate term "unlimited" to label a data plan that was in fact subject to prolonged speed reductions after a customer used a set amount of data; and (2) failing to disclose the express speed reductions that it applied to "unlimited" data plan customers once they hit a specified data threshold.

49.    The FCC found that AT&T's use of the term "unlimited" to label plans that were, in fact, subject to significant speed restrictions after subscribers used a specific amount of data is apparently inaccurate and misleading to consumers.

50.    Although AT&T asserted that it has provided ample disclosures about these policies, the FCC found that these disclosures did not cure AT&T's apparent violations of the Transparency Rule.  According to the NALF, AT&T's practices deprived consumers of sufficient information to make informed choices about their broadband service and thereby impeded competition in the marketplace for such services. Consistent with the Commission's forfeiture guidelines, and based on the seriousness of AT&T's apparent violations, the FCC proposed a forfeiture of $100,000,000 and a set of requirements to bring AT&T into compliance with the Transparency Rule.

### Named Plaintiff Allegations

51.    Plaintiff Shannon Lilienthal entered into a contract with AT&T

wherein AT&T was to provide Plaintiff with mobile phone service, including, but not limited to, unlimited wireless broadband data usage.

52.    Plaintiff used the phone and wireless data plan each month and paid her bill to Defendants.

53.    On Plaintiff's bill from AT&T, she is charged thirty dollars ($30.00) each month for an unlimited wireless broadband data plan.

54.    Towards the end of each billing cycle, Plaintiff noticed her Internet speeds decrease. The reasons were unclear, until recently.

55.    On or about June 17, 2015, Plaintiff learned that the FCC alleged that AT&T sold consumers data plans advertised as unlimited, but then capped data speeds for those subscribers after they used a certain level of gigabytes of data within a billing cycle.

56.    Plaintiff learned that the capped speeds were, according to the FCC, more than 20 times slower than the normal network speeds advertised by AT&T, and that hurt her (and other consumers') ability to access the Internet or use applications.

**Class Allegations**

57.     Plaintiff seeks to represent a Class of plaintiffs as follows:

All Alabama consumers who, since 2011 when AT&T allegedly began throttling mobile data speeds, entered into or renewed their contract with AT&T for a mobile use plan that included an unlimited wireless broadband data plan.

58.     The proposed class should be certified under RULE 23(a) and RULE 23(b)(2) and/or (b)(3).

59.     **Numerosity:**     Plaintiff believes that the Classes she seeks to represent exceed one-hundred class members.

60.     **Commonality & Predominance**:     Common questions of law or fact predominate over individualized questions.  These questions include, but are not limited to, the following:

a.  Whether Defendants AT&T's contract for "unlimited" wireless data plan precludes the throttling of data usage of their customers once they hit a specified data threshold;

b.  Whether Defendants had a uniform practice or policy of capping and throttling their customer's wireless data usage;

c.  Whether such a uniform policy or practice of  violates the language in the customer's contract for "unlimited" wireless data plan;

d.  Whether the Defendants misrepresented the existence of an unlimited wireless plan in order to charge a fee or obtain new

20

customers;

e.  Whether injunctive relief, restitution and/or other equitable relief is an appropriate remedy to correct the alleged violations.

61.   **Typicality:** Plaintiff's claims are typical of the claims that a Class member could assert for the unauthorized capping of their wireless broadband data plan.

62.   **Adequacy:** Plaintiff does not have any conflicts with the proposed Classes and there are no defenses (to Plaintiff's knowledge) that are unique to Plaintiff's circumstances.  Plaintiff has also retained counsel who are well qualified and experienced in prosecuting class actions.

63.   **Rule 23(b)(2):**     Defendants acted in a uniform manner towards the putative Class members making injunctive, declaratory  and other equitable relief appropriate.

64.   **Rule 23(b)(3):**     As noted above, common questions of law or fact predominate over individualized inquiries.  The class action is a superior method for adjudicating these claims because it provides for a more efficient method of resolving questions over the legality of the Defendants' practices and without a class action it is unlikely that absent class members would prosecute this case on an individual basis given the amounts in controversy.

**CAUSES OF ACTION**

**Count I**
**Breach of Contract**
**(Duty of Good Faith & Fair Dealing)**

65.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 64.

66.    The automatic capping and throttling of Plaintiff and Class members' wireless data usage was not authorized under the terms of Plaintiff and Class members' contract with Defendants AT&T.

67.    Defendants breached the contract by, among other things, automatically capping and throttling the wireless usage, which constituted a breach of the obligation of good faith and fair dealing implied as term of Plaintiff and Class members' contract with Defendants AT&T.

68.    Plaintiff and Class members were injured as a result of the Defendants' breach of contract.

**COUNT II**
**Fraudulent/Reckless Misrepresentation**

69.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 64.

70.    Defendants AT&T misrepresented that Plaintiff and Class members' contract with Defendants AT&T included an unlimited wireless broadband plan while throttling Plaintiff and Class members' plans when usage reached a certain

22

level.

71.     Defendants AT&T knew that its representation was false and/or recklessly disregarded that truth of the representation.

72.     Plaintiff and Class members were injured as a result of Defendants AT&T's false and/or reckless misrepresentations.

## Count III
## Negligent Misrepresentation

73.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 64.

74.     Defendants AT&T represented to Plaintiff and Class members that their mobile plan allowed them "unlimited wireless broadband access."

75.     Defendants AT&T lacked reasonable grounds for believing the truth of this representation because, Defendants AT&T knew or should have known that by offering "unlimited plans" it would disrupt the experience of other customers and the more customers that had "unlimited plans" the more it would disrupt service resulting in throttling, but customers were not notified as to what level the throttling would occur, just that AT&T reserved the right to (i) limit throughput or amount of data transferred, deny service and/or terminate service, without notice, to anyone it believes is using the service in any manner prohibited above or whose usage adversely impacts its wireless network or service levels or hinders access to its wireless network.

23

76.     Plaintiff and Class members justifiably relied on the representation that they would have "unlimited wireless broadband data" usage.

77.     Plaintiff and Class members were injured as resulted of AT&T's negligent misrepresentation.

## Count IV
## Unjust Enrichment

78.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 64.

79.     Defendants AT&T charged Plaintiff and retained a fee for an unlimited wireless broadband plan but capped and/or throttled the plan at certain levels.

80.     Retention of such proceeds (or any other benefit received) also constitutes an unjust and unreasonable charge, retention of monies and/or profits belonging to and/or obtained from Plaintiff and Class members.

WHEREFORE, premises considered, Plaintiff respectfully requests that the Court accept jurisdiction over this action and enter a judgment for Plaintiff as follows:

A.     Determining that the action is properly maintainable as a class action pursuant to RULE 23 of the FEDERAL RULES OF CIVIL PROCEDURE;

B.     Enter an injunction directing Defendants to perform an

equitable accounting over the fees improperly charged and unjustly retained, create a constructive trust, and disgorge the *res* of said constructive trust to the putative Class members via resulting restitution;

C.    To the extent the members of the putative Class members cannot be located, said disgorgement via restitution should be *cy pres.*

D.    Entering judgment against Defendants for compensatory and, where applicable, statutory damages;

E.    Entering judgment against Defendants for the cost of this action including a reasonable attorney fee;

F.    Entering judgment against Defendants for interest; and

G.    Granting such other, different and further relief, including equitable, as this Court deems just and proper.

Submitted this the 22nd day of June, 2015.

s/ Eric J. Artrip
D. Anthony Mastando (ASB-0893-X32B)
Eric J. Artrip (ASB-9673-I68E)
MASTANDO & ARTRIP, LLC
301 Washington St., Suite 302
Huntsville, Alabama 35801
Phone:    (256) 532-2222
Fax:    (256) 513-7489
Email:    tony@mastandoartrrip.com
          artrip@mastandoartrip.com

Douglas C. Martinson, II
115 Northside Square
Huntsville, Alabama 35801
Phone:      256-776-7006
Fax:         256-533-1696

DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL:

**AT&T CORP.**
**2 NORTH JACKSON ST., SUITE 605**
**MONTGOMERY, AL 36104**

**AT&T MOBILITY, LLC**
**2 NORTH JACKSON ST., SUITE 605**
**MONTGOMERY, AL 36104**